IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHARON DIXON,                              )
                                           )
            Plaintiff,                     )
                                           )
v.                                         )        CIVIL ACTION NO. 2:05CV326-SRW
                                           )                    (WO)
RAVE MOTION PICTURES, INC., et al.,        )
                                           )
            Defendants.                    )

### MEMORANDUM OPINION AND ORDER

Plaintiff Sharon Dixon brings this action against defendants Rave Motion Pictures,

Inc., Rave Motion Pictures Montgomery, LLC, and Marc R. Bryant alleging that defendants

discriminated against her on the basis of her race in violation of 42 U.S.C. § 1981 and Title

VII of the Civil Rights Act of 1964 in the terms and conditions of her employment and in

terminating her employment and, further, that they terminated her employment in retaliation

for complaining of race discrimination in violation of Title VII and § 1981.  This action is

presently before the court on the motion for summary judgment filed by defendants on June

12, 2006 (Doc. # 45).  Upon consideration of the motion, the court concludes that it is due

to be granted in part and denied in part.

### BACKGROUND[1]

Rave Motion Pictures hired plaintiff as an hourly assistant manager at its Montgomery

---

[1]  As it is required to do, the court has viewed the evidence presented on the motion for
summary judgment in the light most favorable to the plaintiff.  Welch v. Celotex Corp., 951 F.2d
1235, 1237 (11th Cir. 1992).  Defendants have filed a number of motions to strike all or parts of
certain of plaintiff's exhibits.  (Docs. ## 65, 67, 68, 69).  The court will address defendants'
objections, to the extent necessary, in this memorandum opinion.

theater on March 7, 2002.  At the time, the general manager of the theater was Bud Epps.

On September 13, 2002, Rave promoted plaintiff to the salaried position of manager.  On

January 23, 2004, after Epps was terminated, Marc Bryant transferred from the Rave theater

in Baton Rouge and became the general manager in Montgomery.

Two or three weeks after he arrived in Montgomery, Bryant was sitting on a bench

outside the theater smoking and having a conversation with employees Brett Pettit and

Tammy Thomas.[2]  Bryant said that he was "going to get rid of all the black managers."

(Thomas depo., pp. 29-32).  At the time, the only black managers were plaintiff and

Twanfran Jackson.  (Jackson aff., ¶ 3).[3]  Jackson was pregnant and Bryant knew that she

intended to leave her employment with Rave when the baby was due.  (Bryant depo., pp. 51-

52).[4]

On February 20, 2004, less than a month after his arrival, Bryant told his managers,

including plaintiff, that every cash deposit must be verified by another manager before it is

_____

[2]  On February 13, 2004, three weeks after Bryant arrived in Montgomery, Rave offered
Pettit the position of lead manager.  As lead manager, Pettit was plaintiff's supervisor.  (Dixon
depo., p. 82; Plaintiff's Exhibit 23).

[3]  In her affidavit, Jackson states, "During the time that Marc Bryant was at the Rave theater
in Montgomery, Ms. Dixon and I were the only blacks who were in management positions, even
though the majority of the employees were black."  (Jackson aff., ¶ 3).  Defendant objects to this
testimony as "speculation" because Jackson left Rave on September 25, 2004, six months before
Bryant did.  (Bryant depo., p. 31; Jackson aff., ¶ 2).  Jackson was employed by Rave when Bryant
arrived.  (Id.).  The court considers Jackson's testimony on this point to the extent it pertains to the
period of overlap between her employment and Bryant's.

[4]  Bryant testified, "When I got to know [Jackson], she was pregnant and was planning on
leaving when the baby was due.  I probably did not spend a whole lot of time with her in, you know,
training-type things because of that, because I knew that she was – she would be leaving."  (Bryant
depo., pp. 52-53).

placed in the safe.  On February 25, 2004, plaintiff processed a deposit without having it verified by another manager. (Dixon depo., pp. 76-77).  The following day, Bryant discussed the deposit with plaintiff.  She told him that she was the only manager on duty at closing the previous night. (Dixon aff., ¶ 2).[5]  Bryant did not tell plaintiff that he was "writing [her] up." (Dixon aff., ¶ 2).  However, he placed an "employee disciplinary warning" in her personnel file for "improper cash handling" which stated:

> On Wed 2/25/04, Sharon was processing a deposit and did not have it verified by another manager before in [sic] was dropped.  On Fri 2/20/04 in the Managers meeting, I told all managers that every deposit must be verified by another manager before it is dropped in the safe.  Lauren Bishop was present and Sharon did not have her verify it.  The deposit was $50.05 short.  Sharon must be more careful in the cash office and follow the rules that have been put in place.
>
> This is a written verbal warning and will be placed in the file.

(Defendants' Exhibit L).  Although this "written verbal warning" bears a space for the employee's signature, plaintiff did not sign the form.  (Id.).  According to Rave's attendance records, manager Lauren Bishop left work at 9:51 p.m. on February 25, 2004.  The last deposit is normally completed at about 11:30 p.m.  (Plaintiff's Exhibit 11; Dixon depo., pp. 173-74).  Plaintiff did not learn until September 2004 that the warning had been written up and placed in her personnel file. (Dixon aff., ¶ 2).

At some point after the end of February, Coleman Zatarain, an assistant manager, was

---

[5]  Plaintiff states, "[Bryant] was well aware from our discussion that I was the only manager on duty at closing that night and could not have had any one else sign the deposit form."  (Dixon aff., ¶ 2).  Defendant objects to this statement as "speculation."  (Doc. # 67, p. 15).  Although plaintiff cannot testify from personal knowledge about Bryant's "awareness," a reasonable inference can be drawn from her statement that she told Bryant, during their discussion, that she was the only manager on duty at closing.

apparently angry about having to use a medical clinic because he did not have health insurance. He cursed at plaintiff and complained about black people in the clinic and said "[a]ll you do is look for handouts."  Plaintiff complained to Bryant about Zatarain's outburst, about Bishop's scheduling employees to work too many hours and have them work "off the clock," and about lead manager Pettit's falsely recording missing concession items as damaged items.[6]  Bryant told plaintiff that he would look into these matters.   He also told plaintiff that Zatarain was probably having a bad day, and to "just get over it," and that Zatarain was her "equal."  A couple of weeks later, Zatarain cursed at plaintiff again, after she told him to stop throwing chocolate candies on the floor.   A few days later, plaintiff walked into the office when Zatarain was in a meeting with Bryant, Pettit and Bishop.  She said something to Zatarain about his failure to have a movie ready for pick-up the previous night.  As she was leaving, Zatarain threw something toward plaintiff.  When she asked Zatarain if he had thrown something at her, Bryant, Pettit and Bishop all laughed.  Zatarain followed plaintiff and cursed at her, telling her that because she was late that morning, it was her fault "the MF wasn't ready."  Plaintiff again reported Zatarain to Bryant.  She also called Richard Garrett at Rave's corporate office and told him about the problems with Zatarain and about Pettit falsifying the concession inventory.  After plaintiff reported the problems to Garrett, she approached Bryant while he was in the lobby talking with Mary Griffith, a security guard.  Bryant told Griffith that plaintiff "should choose [her] battles carefully."

---

[6] Missing concession merchandise affected Pettit's monthly bonus check. (Dixon depo., pp. 97-98).

(Plaintiff's Exhibit 4; Dixon depo., pp. 98-131).

Shortly thereafter, plaintiff started "getting write-ups."  (Dixon depo., pp. 114, 125).

On March 26, 2004, white manager Bishop closed out an employee's concession register but

placed the money in the safe without processing it.  Plaintiff was unaware of the money in

the safe and failed to follow proper closing procedures, which resulted in an apparent cash

shortage in concession.  Plaintiff found the money the following day and explained to Bryant

what had happened.  Plaintiff agreed that the cash mix-up was her fault, as she should have

followed through on closing procedure. Bryant gave plaintiff an employee disciplinary

warning for improper cash handling.  However, Bishop was not written up for her cash

handling error.  (Dixon depo., pp. 80-82; Defendant's Exhibit N; Dixon aff., ¶ 5[7]).

---

[7]  In her affidavit, plaintiff states:

> When I researched the problem I discovered that Lauren Bishop, a white manager, had not properly closed out her shift when she left that day.  I accepted responsibility for not catching her error earlier, but Mr. Bryant did not write her up for her error in cash handling. . . . I have had an opportunity to examine Ms. Bishop's personnel file and there are not write-ups of any kind there . . . .

(Dixon aff., ¶ 5). Rule 56(e) provides that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith."  Defendant moves to strike this portion of paragraph 5 because plaintiff has failed to attach Bishop's personnel file to her affidavit. (Doc. # 67, pp. 10-11). The court declines to interpret Rule 56(e) to require that plaintiff attach the entire personnel file to demonstrate the absence of a write-up for this incident, particularly since: (1) defendant has the personnel file in its possession and cannot claim a lack of knowledge of the content of that file; (2) although the court gave defendant leave, after plaintiff's response, to supplement its evidentiary submission as to other evidence, the defendant has not sought leave to introduce documentation that Bishop was disciplined for this cash handling error; and (3) defendant has suffered no prejudice by plaintiff's failure to attach the file. Cf. Catawba Indian Tribe of South Carolina v. State of South Carolina, 978 F.2d 1334, 1341 n. 5 (4th Cir. 1992)("We reject the Tribe's argument that certain affidavits were insufficient because they did not attach certified copies of all the documents referred to in the affidavits. The documents referred to are, in most, if not all, cases, available as public records concerning property. The Tribe has not disputed the veracity of the statements concerning the use of the property and thus have not shown the need for a trial. Also the

On April 18, 2004, lead manager Pettit verbally counseled plaintiff for errors in concession, including: (1) items left unsecured; (2) the refrigerator left unlocked; (3) counts off on cups, candy items, hot dogs and nachos; (4) soda fountain not cleaned; (5) hot dogs left in refrigerator rather than transferred to main concession; (6) hot dog buns left in warmer; and (7) water not restocked for the next opening.  Pettit documented the counseling with a memorandum in plaintiff's personnel file.  Some of the items listed by Pettit as unsecured – the small, medium, and large popcorn bags and the kids' cup – were display items which are normally left out.  Additionally, the lock for the refrigerator had been missing for a couple of days.  (Defendants' Exhibit P; Dixon depo., pp 83-87).[8]

On August 7, 2004, Bryant sent an e-mail directing managers, including plaintiff, to

---

Tribe does not contest the content of the documents referred to or even state it does not know their content. Thus, it has shown no prejudice for any non-compliance with the rule.").  Defendant has introduced a copy of memorandum from Bishop's personnel file – apparently not a formal disciplinary action since it is not on defendant's "employee disciplinary warning" form – which states, "This is to document that a manager has notified me that Ms. Bishop is discussing things with employees that she should not.  Ms. Bishop has confirmed that this is true and understands that if this occurs again she will be disciplined further."  The memorandum is signed by Bryant, Bishop and Pettit.  (Exhibits 1 and 3 to Doc. # 86).  This exhibit is evidently intended to impeach plaintiff's credibility regarding the lack of disciplinary action in Bishop's personnel file.  However, it confirms that defendant has the ability to counter plaintiff's affidavit – despite plaintiff's failure to attach Bishop's personnel file to the affidavit – with proof of documents in the file.  As noted above, defendant has not sought to introduce evidence that Bishop was, in fact, disciplined for her cash handling error on March 26, 2004.

[8] Dixon states in her affidavit that Pettit did not write up any white managers for the display items or the unlocked door.  Defendant objects to this evidence and the court concurs that it should not be considered. Plaintiff's affidavit does not adequately demonstrate the basis for her personal knowledge of this broad assertion – for instance, she does not identify which white supervisors worked during the period of time when the lock was missing, nor does she provide evidence of Pettit's knowledge of the specific errors by the white managers.  Additionally, Pettit's write-up encompasses more than just the display items and the unlocked refrigerator door, so the statement, even if considered, is of limited relevance.

have training outlines for assigned areas completed by August 14th. Plaintiff was assigned to prepare the outline for "Supervisors," which was to include box office, concessions, and ushers. (Defendants' Exhibit Q). At the time, plaintiff's father was terminally ill and in the hospital, and plaintiff took time off from work to stay with him.  Plaintiff's father passed away, and his funeral was held on August 18, 2004. Plaintiff returned to work several days later. (Dixon aff., ¶ 7; Plaintiff's Exhibit 14; Plaintiff's Exhibit 16).

Bryant gave plaintiff an employee disciplinary warning dated August 31, 2004 which stated:

> On Tues. 8/31/04, Sharon was the senior manager on duty and was also responsible for doing inventory on that evening. On Wed. 9/1/04 the opening manager found the stock room door to the main support room left wide open. I have made it clear to al[l] managers that that room is to be kept closed and locked at all times. This is Sharon's third write up for operational issues and performance. If Sharon fails to meet the standards and guidelines in the future, it can result in further disciplinary action up to and including termination of employment.

(Defendants' Exhibit U). However, all the doors had been locked and, contrary to Bryant's warning, lead manager Pettit was the senior manager on duty on August 31, 2004. (Dixon aff., ¶ 8[9]; Dixon depo., p. 95).   Plaintiff denied that the door had been left open. (Dixon depo., p. 96).  In her written response to the disciplinary warning, plaintiff stated:

> As to my knowledge all doors were closed and locked[.] I was not the only manager that night.  Also I feel that this is retaliation for my going to the Regional about the issue going on in this theater.  I am very sure that the door was locked also I ask if I could have closing employee that night verify that the

---

[9] Defendant objects to this paragraph as "speculation, conclusory argument, and the hearsay of another employee."  (Doc. # 67, p. 15).  The court agrees with the hearsay objection to the extent that plaintiff relies on verification by the other employee.  However, plaintiff was also present that night and may testify from her own personal knowledge that the doors were locked.

door was locked.  Mr. Bryant refused.

(Defendants' Exhibit U).  Plaintiff left Bryant's office and asked the closing employee, Fummie, whether Fummie remembered the door being open.   (Dixon depo., pp. 139-40; Defendant's Exhibit X).

On September 2, 2004, Bryant sent plaintiff an e-mail reminding her of his requirement for a training outline, and asking her to let him know when he could expect her outline.  (Plaintiff's Exhibit 18; Defendants' Exhibit T).  Plaintiff's assignment was to combine all of the outlines and schedules into one outline and schedule for the supervisors. She could not complete her outline, however, until she received the outlines from the other managers.  Plaintiff did not receive outlines from any manager except Jackson, and did not complete her assigned outline in the four days between Bryant's September 2, 2004 e-mail and plaintiff's termination.[10]

On September 3, 2004, Bryant sent an e-mail to Ron Walker, the regional manager, stating that he had been told by one of his managers that plaintiff and Fran Jackson were in the lobby following Bryant's previous discussion with plaintiff and that plaintiff said, "They have no idea what they are in for, Sister."  (Plaintiff's Exhibit 19; Defendants' Exhibit W). However, no such conversation between plaintiff and Jackson had occurred.  (Jackson aff.,

_____

[10]  Defendants object to paragraph 9 of plaintiff's affidavit as "speculation and conclusory argument. (Doc. # 67, ¶ 9).  The court agrees that plaintiff's statement, "Mr. Zatarain and Mr. Walker have not, to my knowledge, been reprimanded for not getting their assignments in to me on time," is due to be stricken.  However, plaintiff may testify from personal knowledge that she needed the outlines from the other managers to complete her assignment and that the only outline she received before her termination was from Jackson.

¶ 13[11]; Dixon depo., p. 138).

On September 4, 2004, plaintiff was to bring "employee of the month" trophies to a staff meeting. She forgot to bring the trophies to work with her and left work to get them. She did not return in time for the meeting. (Dixon depo., pp. 138-39). Bryant gave plaintiff a write-up for failing to bring the trophies, leaving work without approval, and for discussing the most recent disciplinary session with staff. Plaintiff refused to sign the write-up, stating, "I ask the closing employee that night if she remember the candy room door being left open. Once again I feel like this is unjust. And I am refusing to sign this[.]" (Defendants' Exhibit X; Dixon depo., pp. 139-142).

On September 5, 2004, Ron Walker sent Bryant an e-mail forwarding a copy of an anonymous complaint received through the corporate website. The complaint states, in part:

> Ms. Dixon be trying to get all the black folks to email the corporate office about how we are unfairly treated. But we all know ms. [sic] Dixon is trying to cover het [sic] butt. She always late, always complaining and always trying to tell us how she is discriminated against, and "racially profiled". She just trying to get us black folks to take her side and that make me mad because I like my job. The managers treat me ok.
>
> *   *   *   *   *
>
> But ms. [sic] Dixon need to quit telling peopleshe's [sic] going to get Mr.Bryant fired. She never works hard like Mr.Bryant or Mr.Zatarain, so I think she just wants to be general manager.

(Defendants' Exhibit Y; Bryant aff.,¶ 24).

_____

[11] Defendants object to portions of paragraph 13 of Jackson's affidavit; however, they do not object to Jackson's statement that Dixon never made this statement to Jackson. (See Doc. # 65, p. 4).

9

On September 6, 2006, Bryant met with plaintiff and terminated her employment. Initially, he did not tell plaintiff the reason for her termination. Then he told her that he had received an e-mail from an employee saying that plaintiff "was trying to start a riot against him by talking to all the black employees and turning them against him." (Dixon aff., ¶ 10; Bryant aff., ¶ 27; Bryant depo., pp. 96-97).

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993). In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves. . . ."

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element

of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

## DISCUSSION

### Individual Liability Under Title VII

Defendant argues, and plaintiff concedes (see Doc # 53, p. 13), that individual defendant Bryant is not subject to liability under Title VII. Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991)("The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act."). Thus, to the extent the complaint asserts any such claims, they are due to be dismissed.

11

**Termination Claim**

Plaintiff has produced evidence that, a few weeks after Bryant arrived at the Montgomery Rave theater, he announced his intention to "get rid of all the black managers." (Thomas depo., pp. 29-32). Plaintiff was one of two black managers – Bryant believed that the other black manager, who was then pregnant, intended to quit when her baby was due. It is undisputed that, although Ron Walker approved plaintiff's termination, Bryant was a decisionmaker. (Bryant depo., pp. 95-96, 128; Defendants' Exhibit Z, answer to interrogatory no. 9). Defendant argues that Bryant's statement was an "isolated remark" and that, because it was made several months before plaintiff's termination, it does not constitute direct evidence of discriminatory intent as to plaintiff's termination.

> Direct evidence is evidence which, if believed proves the existence of a fact without inference or presumption. Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999). The Eleventh Circuit has stated that "only the most blatant remarks, whose intent could be nothing other than to discriminate on the [protected classification]" are direct evidence of discrimination. Damon v. Fleming Supermkts. of Fla., Inc., 196 F.3d 1354, 1359 (11th Cir. 1999)(internal quotation marks omitted). To be direct evidence the remark must indicate that the employment decision in question was motivated by race. See id.

Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002). In Scott, relied on by defendants, the Eleventh Circuit concluded that the remark "We'll burn his black ass" did not constitute direct evidence as to the plaintiff's termination where the comment was made by plaintiff's supervisor two and one-half years before plaintiff's termination – while the supervisor was "merely one of [plaintiff's] co-workers" – and was not directly related to the subject of plaintiff's termination. In the present case, in contrast, the statement

12

at issue was made by plaintiff's supervisor less than seven months before plaintiff's termination, and it related to the subject of "get[ting] rid of all the black managers."[12]  The court readily concludes that Bryant's statement "indicate[s] that the employment decision in question was motivated by race" (Scott, *supra,* 295 F.3d at 1228) and, thus, that it is direct evidence as to plaintiff's discriminatory termination claim.[13]  Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998)(citation omitted); cf. Miles v. M.N.C. Corp.., 750 F.2d 867, 874-75 (11th Cir. 1985)(statement made by supervisor at some point between 1979 and March 1980 that he did not hire blacks because "[h]alf of them weren't worth a shit" found to be direct evidence as to employment actions in January and June 1980).

Since plaintiff has produced direct evidence of discriminatory intent, defendant's motion for summary judgment is due to be denied with regard to plaintiff's discriminatory termination claim.

### Hostile Environment Claim

To prevail on her hostile environment claim, plaintiff must establish that: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the

---

[12]  Additionally, within a week or two after this comment, Bryant placed the first disciplinary write-up in plaintiff's personnel file – for failing to have another manager verify a deposit – without telling plaintiff about the write-up or having her sign it, and after plaintiff had advised Bryant that she was the only manager on duty at the time.

[13]  Even if it is *not* direct evidence, the statement is evidence of discriminatory intent sufficient under the particular circumstances of this case to establish both plaintiff's *prima facie* case and an issue of fact as to pretext.  See Herawi v. State of Alabama Dept. of Forensic Sciences, 311 F. Supp.2d 1335 (M.D. Ala. 2004).

harassment was based on her race; (4) the harassment affected a term, condition, or privilege of her employment; and (5) a basis for holding the employer liable.  See Johnson v. Booker T. Washington Broadcasting Service, Inc., 234 F.3d 501, 508 (11th Cir. 2000).  To satisfy the fourth element, conduct must be objectively[14] "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)(quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is a physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris, 510 U.S. at 23.

To demonstrate "severe or pervasive" conduct by defendants, plaintiff relies on the following incidents (see Plaintiff's brief, pp. 20-22):

a.  In February 2004, Bryant placed a disciplinary write-up in plaintiff's file because she failed to have Bishop verify the bank deposit, even though Bishop was not present at closing;

b.  In September 2004, Bryant disciplined plaintiff for leaving the supply room door unlocked and refused plaintiff's request that he verify with the closing employee that the door was locked;

---

[14]  Defendants do not appear to contend that plaintiff did not subjectively perceive the environment to be sufficiently severe or pervasive.

14

c.  In March 2004, Bryant failed to discipline Bishop for her cash handling error, but disciplined plaintiff for failing to follow closing procedures.[15]

d.  Bryant failed to discipline Zatarain for the offensive racial comment he made to Dixon;[16]

e.  Bryant "regularly isolated the black managers, Dixon and Jackson, by excluding them from management activities and meetings that he permitted white managers to engage in; and, when they were included in management meeting, refused to allow them to have any input."

f.  Bryant discriminated against a black teacher by refusing to allow her to bring her class to the theater for a field trip but approving the same request from a white teacher who called on the same day.

Additionally, plaintiff argues generally that Bryant subjected plaintiff to "disciplinary actions that were not directed to white managers who engaged in the same behaviors." (Plaintiff's brief, p. 21).  With regard to the latter, plaintiff cites paragraphs 6-8 and 12 of Jackson's affidavit.[17]  Defendant has objected to this evidence.  Even assuming that this

---

[15]  Plaintiff accepts the disciplinary write-up placed in her file on this occasion as "valid." (Plaintiff's brief, p. 21).

[16]  In her brief, plaintiff refers to "offensive racial comments"; however, the record contains evidence of only one racial remark.

[17]  Jackson states:

6. . . . Ms. Dixon and I became increasingly aware that Mr. Bryant was showing favoritism to the white managers.  He would have meetings with the white managers and not tell Ms. Dixon or myself about them.  He gave Ms. Bishop, who was an assistant manager like me and subordinate to Ms. Dixon, the authority to make

affidavit testimony by Jackson is fully admissible on the present motion, however, the evidence fails to establish that plaintiff was aware – at any time *during her employment* – that Bryant had not disciplined white employees for particular infractions. The same is true of Bryant's failure to discipline Bishop for her part in the March 2004 cash handling error, and Bryant's failure to discipline Zatarain for the offensive racial comment and for cursing at plaintiff.  To the extent that plaintiff has personal knowledge of Bishop's and Zatarain's

---

schedules and to hire staff.  He also failed to discipline Ms. Bishop on a number of occasions when she should have been.  Ms. Bishop had a relationship with an underage co-employee which was against company policy, and even checked him out of school without his parents' permission.  She also tried to get employees who were of legal age to buy alcoholic beverages for her.  Marc Bryant was aware of these situations and even met with the young man's parents, but he never wrote Ms. Bishop up or even reprimanded her for any of these things.

7.  Mr. Bryant also refused to discipline Coleman Zatarain, a white assistant manager, for angrily cursing at Ms. Dixon, and using a racial slur one day in the Rave's offices. I was in the room next to the office and overheard Mr. Zatarain use a racial slur in his ranting to accuse blacks of wanting everything for free.  I know that this was reported to Mr. Bryant but he did not do anything about it.

8.  Additionally, I know that Ms. Bishop, Mr. Zatarain, and Chris Walker, another white assistant manager, frequently had shortages at closing and they each had several occasions that I know of when doors were not secured properly on days they were responsible for closing.  Mr. Bryant never wrote them up for these things although he wrote Ms. Dixon up several times.

12.  I understand that Rave or Mr. Bryant is claiming that Ms. Dixon refused to complete the training outlines that she was assigned to put together.  It was necessary for all of the assistant managers to complete their outlines before Ms. Dixon could combine those into her assignment.  I was the only assistant manager that turned in an outline.  Ms. Bishop was assigned to work with me on this, but she did not do anything to help.  Mr. Walker and Mr. Zatarain were supposed to complete the other portion and turn it in so Ms. Dixon could compile and complete the assignment without all of the outlines.  I believe that Mr. Bryant asked her about the project a few days before he fired her.

(Jackson affidavit, ¶¶ 6-8, 12).

disciplinary history, that knowledge comes from her review of documents produced by defendants in the course of discovery in this action, well after plaintiff's termination. (See Dixon aff., ¶¶ 3, 5; Doc. # 77, Plaintiff's response to defendants' motion to strike portions of plaintiff's affidavit at p. 3 ("[Plaintiff] makes the relevant statements [regarding lack of discipline of white managers] from her personal knowledge of documents which were produced and certified as complete by the defendants.")).  Plaintiff has not pointed to evidence that she became aware of Bishop's or Zatarain's or any other white manager's disciplinary record through other means while she was still employed by Rave.  Conduct not known to the plaintiff during her employment cannot have contributed to a hostile environment.  See Horne v. Russell County Commission, 379 F. Supp.2d 1305, 1322 (M.D. Ala. 2005).  Since plaintiff has not directed the court to competent evidence that she knew prior to her termination that Bryant failed to discipline Bishop and Zatarain, the court does not consider this failure to discipline in assessing plaintiff's hostile environment claim.[18] Additionally, the instance of alleged discrimination involving the school field trip did not occur until October 2004, a month after plaintiff's termination.  (See Plaintiff's Exhibit 28). Thus, this incident cannot form a basis for plaintiff's hostile environment claim.[19]

---

[18]   However, the court will consider plaintiff's testimony that Bryant told plaintiff that Zatarain was probably having a bad day, and to "just get over it," and that Zatarain was her "equal." (Dixon depo., p. 104).  She also testified that Bryant told her he would look into this and the other matters she raised.  Plaintiff stated that she does not think he did so, but does not know whether he did.  (Id. at pp. 104-06).

[19]   Plaintiff does not specifically identify the write-up by Pettit as part of her hostile environment claim.  There is no competent evidence that this write-up was motivated by plaintiff's race and, therefore, this incident cannot be considered on the hostile environment claim. Additionally, the write-up addressed a number of concession area deficiencies, and plaintiff has

As noted above, plaintiff bases her hostile environment claim, in part, on her allegation that Bryant "regularly isolated the black managers, Dixon and Jackson, by excluding them from management activities and meetings that he permitted white managers to engage in; and, when they were included in management meeting[s], refused to allow them to have any input."  (Plaintiff's brief, pp. 21-22).   Plaintiff cites paragraph 6 of Jackson's affidavit,[20] in which Jackson states, "[Bryant] would have meetings with the white managers and not tell Ms. Dixon or myself about them."  The cited evidence does not go to the issue of whether plaintiff and Jackson were permitted to "have any input" in meetings, and the court has located no citation to any such evidence elsewhere in plaintiff's brief.  Further, the cited evidence is insufficient to prove that Dixon and Jackson were "regularly isolated" by exclusion from management meetings. Fed. R. Civ. P. 56(e) requires that the party opposing summary judgment "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).   The Eleventh Circuit has "'consistently held that conclusory allegations without specific supporting facts have no probative value.'" Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000)(quoting Evers v. General Motors Corp., 770 F.2d 984, 985 (11th Cir. 1985));  see also Miller v. Citizens Security Group, Inc., 116 F.3d 343, 346 (8th Cir. 1997)("A conclusory statement in an affidavit, however, cannot create a genuine issue of material fact which precludes summary judgment.").  The only *specific* evidence the court has noted in the record concerning plaintiff's exclusion from a

---

contested only the portion regarding display items and the unlocked refrigerator door.

[20]  The text of this paragraph is set forth *supra* at n. 17.

meeting is in the affidavit of Kenya Harris. Harris testifies that he was summoned to a meeting in which Bryant questioned him about a cash shortage, and that all of the white managers – Bryant, Pettit, Zatarain, Walker, and Bishop – were present, but Dixon and Jackson were not. (Harris affidavit, ¶¶ 5-6).[21]  However, plaintiff has again failed to direct the court to competent evidence[22] that she was aware of this meeting during her tenure with Rave.[23]  Accordingly, plaintiff's and Jackson's exclusion from the Kenya Harris meeting cannot be considered for purposes of the hostile environment claim.

Of the incidents identified by plaintiff as forming the basis for her hostile environment claim, this leaves the disciplinary write-ups in February, September, and March 2004 and the underlying "offensive racial comment[]" made by assistant manager Zatarain. See Plaintiff's brief, pp. 21-22. Zatarain's conduct in loudly cursing and swearing while complaining about about black people in the clinic "look[ing] for handouts" (see Dixon depo., pp. 106-08), if taken as true, was offensive and inappropriate. However, its severity is lessened by the fact that the Zatarain is plaintiff's subordinate, not her supervisor. Further, although Zatarain cursed at plaintiff on two additional occasions – once when she chastised him for throwing

---

[21]  Defendants object to portions of Harris' affidavit, but not to these paragraphs.

[22]  Harris testifies that Jackson did not know about the meeting until September 4, 2004, two days before plaintiff's termination and that "[s]he was very upset because neither she nor Ms. Dixon had been informed about the disciplinary meeting." (Harris aff., ¶ 12). This testimony does not clearly indicate that plaintiff was aware that the meeting had occurred and that she had been excluded. However, even if the statement suggests Dixon's knowledge, it is inadmissible hearsay and cannot be considered on the present motion.

[23]  Plaintiff was aware of this incident by the time of her deposition. (See Dixon depo., p. 159). However, plaintiff has cited no evidence permitting an inference that plaintiff was aware of this meeting during her employment.

candy on the floor ("I am so tired of this GD")[24] and once when he was blaming plaintiff for

the movie not being picked up ("[i]t's your fault the MF wasn't ready")[25] – neither of these

instances involved explicit racial comments.

Plaintiff concedes that the March 2004 write-up was valid, and that she failed to

follow proper closing procedures. (Plaintiff's brief, p. 21; Dixon depo., pp. 80-82; Plaintiff's

Exhibit 12). Plaintiff has provided evidence that Bryant gave her the February 2004 write-up

for failure to have another manager verify the bank deposit even after plaintiff told him that

she was the only manager on duty at the time and even though Bishop's attendance record

verifies that Bishop left the theater before closing. Plaintiff has also introduced evidence,

concerning the September 2004 write-up for leaving the supply room door open, that the door

was closed when she left the previous evening, that Pettit was the senior manager on duty

that evening,[26] and that Bryant refused plaintiff's request that he verify with the closing

employee that the door was locked. When this evidence is viewed in conjunction with

Bryant's announced intention to get rid of the black managers, it is reasonable to infer that

these two disciplinary write-ups were racially motivated. However, plaintiff learned of both

of these write-ups at the same time – on or after September 1st,[27] within five days of her

termination – when plaintiff demanded that she be allowed to copy all of the warnings in her

---

[24] Dixon depo., pp. 117-18.

[25] Dixon depo., pp. 121-22.

[26] Dixon depo., p. 95.

[27] Dixon aff., ¶ 2; Defendants' Exhibit 22.

20

personnel file after Bryant had accused her of leaving the door open.  Thus, the impact of these write-ups on plaintiff's working environment was of short duration.

Additionally, plaintiff testified as follows:

Q. When you say that you were excluded from communications regarding the routine functions of the movie theater by Marc Bryant, what specifically were you excluded from?

A. Hiring.  If Marc would decide we were going to be handling something, he would tell the white managers and wouldn't tell us what was going on.  So we are just standing there looking at each other.

Q. What specifically are you talking about?

A.  If he changed the time of a movie, if he was going a movie from one theater to the other.  Just things that were going on in the theater.

(Dixon depo., pp. 158-59).  This testimony is extremely vague.  The court considers it as evidence that on more than one occasion, Bryant did not advise plaintiff of such things as a time change, but did advise one or more white managers.  However, the court cannot discern from plaintiff's testimony the frequency with which any such failures occurred.  Thus, the court cannot conclude that Bryant's failure to communicate with plaintiff caused more than a minimal impact on plaintiff's work environment.

Plaintiff has produced evidence that Bryant delegated hiring and scheduling decisions to white assistant manager Bishop.  (Jackson aff., ¶ 6).[28]  Plaintiff told Bryant that she wanted to do the hiring and scheduling, but Bryant responded that he "wanted [Bishop] to learn how to do it."  (Dixon depo., pp. 152-53).

---

[28]  Defendants object to portions of paragraph 6, but not to this specific statement.

In summary, plaintiff may have been subjected in fact to conduct sufficiently severe or pervasive to alter the terms and conditions of her employment.  However, plaintiff bears the burden of demonstrating – through the introduction of competent evidence of specific facts – that there is a genuine issue of fact as to whether this is so.  Considering the totality of the circumstances, the court concludes that plaintiff has failed to satisfy this burden.[29]  Accordingly, defendants are entitled to summary judgment on plaintiff's hostile environment claim.

### Terms and Conditions Claim

---

[29]  In the fact section of her brief, plaintiff discusses evidence that she argues demonstrates other discriminatory conduct by Bryant.  Many of the facts argued by plaintiff are not supported by competent evidence.  For instance, plaintiff argues that Bryant selected Walker (a white high school graduate) over Searcy (a black college graduate) for an assistant manager vacancy, even though Bryant considers level of education to be an important qualification.  The only evidence of Walker's and Searcy's educational backgrounds is in Jackson's affidavit.  However, Jackson's statement does not demonstrate that she has personal knowledge of the education level of Walker or Searcy.  Plaintiff also cites Jackson's affidavit testimony that Searcy was promoted to assistant manager only after plaintiff initiated this action.  However, Jackson also states that she left Rave on September 25, 2004; plaintiff filed this action several months later.  Thus, it is apparent that Jackson's testimony on this point is not based on her personal knowledge.  Citing her own affidavit and Harris' affidavit, plaintiff argues that the only staff terminated by Bryant were black employees, and that all white employees who left did so voluntarily.  Plaintiff's affidavit does not indicate that she was personally involved with the terminations of employment, nor does it indicate how she came to have knowledge of whether particular terminations were voluntary or involuntary.  The same is true of Harris' affidavit.  Plaintiff further argues that Bryant replaced her with a white female.  She cites an offer of employment to Brandi Futhey (Plaintiff's Exhibit 27), which does not indicate Futhey's race.

While plaintiff has established that Bryant hired two white managers, Pettit and Walker, this fact has very limited bearing on plaintiff's hostile environment claim absent competent evidence that he hired them over more qualified black applicants.   Although plaintiff has not identified this incident in her discussion of her hostile environment claim, the court has considered plaintiff's testimony concerning Pat Thomas in assessing the hostile environment claim.  Thomas is black and was the theater's cleaning crew contractor.   Plaintiff testified that, while she was standing in the lobby with Bryant talking about babies, she identified Thomas' white wife to Bryant.  Bryant then said, "I am surely going to fire this man now."   Bryant fired Thomas a week or two after the comment.  Bryant had complained to plaintiff at some point that Thomas was not cleaning the theater properly.  (Dixon depo., pp. 187-94).

To establish a claim under Title VII's anti-discrimination clause, plaintiff must demonstrate, as part of her *prima facie* case, that she suffered an adverse employment action. Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1238 (11th Cir. 2001).  "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000).  Defendant argues that plaintiff cannot establish a "terms and conditions" disparate treatment claim independent of her termination claim because the other conduct of which she complains does not constitute an adverse employment action. (Defendants' brief, pp. 19-21). Plaintiff does not respond directly to this argument.  Instead, plaintiff argues that she satisfies the "adverse action" element because she was terminated from her employment.  She then turns to discussion of whether she was treated less favorably than similarly situated employees. (Plaintiff's brief, pp. 14-19).  Thus, it appears that plaintiff treats her claim as a single claim of disparate treatment – one based on termination resulting from discriminatory application of work rules.

Plaintiff argues that she was written up for certain infractions while similar or more serious infractions did not lead to write-ups for white employees.  However, there is no evidence that the write-ups, standing alone, constitute a materially adverse change in the terms and conditions of plaintiff's employment. See Hooks v. Bank of America, 2006 WL 1529093, *2 (11th Cir. May 5, 2006)(oral and written reprimands did not constitute adverse

employment action where plaintiff's pay, hours and job duties remained the same after the incidents); Davis, *supra* (negative job performance counseling memoranda did not constitute adverse employment actions).   Rather, the write-ups materially affected the terms and conditions of plaintiff's employment only to the extent that they were used to justify her termination.   Plaintiff does not argue otherwise, nor does she contend that other actions by defendant – except for her termination – constituted adverse employment actions. Accordingly, to the extent plaintiff's complaint asserts an independent terms and conditions claim, defendants are entitled to summary judgment on the claim.

### Retaliation Claim

To establish a *prima facie* case of retaliation under Title VII, plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.  Batch v. Jefferson County Child Development Council, 2006 WL 15437776, *2 (11th Cir. Jun. 7, 2006)(unpublished opinion).  Race-based retaliation claims are also cognizable under § 1981. Id. (citing Andrews v. Lakeshore Rehabilitation Hospital, 140 F.3d 1405 (11th Cir. 1998)).

"A plaintiff engages in 'statutorily protected activity' when he or she protests an employer's conduct which is actually lawful, so long as he or she demonstrates 'a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 (11th Cir. 1998)(quoting Little v. United Technologies, Carrier Transicold Division, 103 F.3d 956, 960 (11th Cir. 1997)). However,

24

[i]t is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component.  A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that he employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented.  It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

<u>Little</u>, *supra*, 103 F.3d at 960 (emphasis in original).

Defendant argues that plaintiff cannot establish that she engaged in protected activity because her complaints to Garrett[30] at the corporate office did not include allegations of racial discrimination and her complaints to Bryant are not supported by an objectively reasonable belief of discrimination.  Plaintiff responds that: (1) the anonymous e-mail to Rave's customer complaint box "contains evidence that [plaintiff] was complaining about Bryant's race discrimination at the theater"; (2) Dixon and Jackson "offer testimony that [plaintiff] made several complaints of discrimination due to Zatarain's comments as well as Bryant's management of the theater; and (3) Bryant told plaintiff that he was firing her for "'trying to start a riot.'" (Plaintiff's brief, p. 23).

<u>The anonymous e-mail complaint</u>.  The relevant portion of the anonymous complaint to the corporate website is set forth above.  Plaintiff contends that this establishes that she was engaging in protected conduct.  While the e-mail from Walker to Bryant forwarding the complaint (Defendants' Exhibit Y) is admissible to show that Bryant was made aware of the

---

[30]  Defendants discuss complaints to "Gehrig," which is most likely the correct name.  However, the court refers to this individual as "Garrett," the name used in plaintiff's deposition testimony.

complaint, it is not admissible evidence of the truth of the matter asserted by the anonymous declarant.  Thus, plaintiff may not rely on it to establish that she tried to get "all the black folks to email the corporate office about how [they were] unfairly treated" or that she was always telling them how she was discriminated against and racially profiled.  Additionally, even if this e-mail were admissible, it lacks sufficient specificity to establish that plaintiff was engaging in protected conduct.  Making an allegation of "discrimination" or racial profiling is not protected activity, unless it is supported by underlying facts sufficient to give rise to an objectively reasonable belief of discrimination.  In considering the objective component of the "protected activity" element, the court is required to conduct a detailed examination of the facts and weigh those facts against the law.

> The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law.  See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 n. 2 (11th Cir. 1998)(failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry").

Clover v. Total System Services, Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).[31]  Additionally, in evaluating the objective reasonableness of the plaintiff's belief, the court looks only to the conduct the person opposed[32] and not to conduct of which the plaintiff was unaware.  Id. at 1352 ("For opposition clause purposes, the relevant conduct does not include conduct that

---

[31]  However, as noted above,"[a] plaintiff . . . need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment."  Little, *supra*, 103 F.3d at 960.

[32]  Plaintiff's retaliation claim arises under the opposition clause of Title VII's anti-retaliation provision,  42 U.S.C. § 2000e-3(a).

actually occurred . . . but was unknown to the person claiming protection under the clause. Instead, what counts is only the conduct that the person opposed, which cannot be more than what she was aware of.  Additional conduct or allegations unknown to the opposing person are not relevant to the opposition clause inquiry.").

The e-mail lacks sufficient detail to permit an evaluation of whether the specific conduct opposed by the plaintiff during her conversation or conversations with the anonymous declarant could support an objectively reasonable belief that discrimination had occurred.  Likewise, Bryant's statement to plaintiff when he terminated her that he "had received an email from an employee that I was trying to start a riot against him by talking to all the black employees and turning them against him"  (see Dixon aff., ¶ 10) provides neither competent evidence nor specific details of any underlying conduct by plaintiff.

Jackson's testimony regarding plaintiff's complaints of discrimination.  Plaintiff argues that she and Jackson "also offer testimony that [plaintiff] made several complaints of discrimination due to Zatarain's comments as well as Bryant's management of the theater." (Plaintiff's brief, p. 23).  In her affidavit, Jackson states, "Many of the theater's black employees, including me, were talking with Ms. Dixon who was taking the lead in trying to get Rave to deal with the discrimination at the theater . . . ." (Jackson aff., ¶ 13).  Defendant contends that Jackson's statement is hearsay.  The court agrees that the statement does not demonstrate that Jackson had personal knowledge that other black employees were talking with plaintiff and, if she learned this from either plaintiff or the other employees, it is inadmissible hearsay.  Jackson may testify that she herself spoke with plaintiff.  However,

27

Jackson's statement that plaintiff "was taking the lead in trying to get Rave to deal with the discrimination" does not provide specific facts about what, exactly, plaintiff did or said. This general statement by Jackson provides the court with no basis for evaluating plaintiff's underlying conduct to determine whether it qualifies as "protected activity."

Plaintiff's testimony regarding her "complaints of discrimination." In her affidavit, plaintiff states that she "reported Coleman Zatarain's racial slurs and verbal abuse" to Bryant and then to "Rave's corporate offices." (Dixon aff., ¶ 3). She further states, "I made several complaints to the corporate offices about Mr. Bryant's racially discriminatory actions at the theater, but Rave has failed to produce any record of these." (Id. at ¶ 11).

The latter statement is devoid of specific facts which would permit the court to determine whether the "several complaints to the corporate offices" constituted protected activity.[33] With regard to the former statement, the specific evidence of record reveals but one racial comment – Zatarain's comment about black people always looking for handouts. Plaintiff reported this comment to Bryant, who told her that he would speak with Zatarain about it, and that plaintiff "needed to understand that Mr. Zatarain was on an equal level with [her] in the theater." (Dixon aff., ¶ 3). Zatarain cursed at plaintiff on two additional occasions, but these incidents did not include racial comments. Plaintiff thereafter

---

[33] Although this is not clear from her affidavit, plaintiff argues in response to defendant's motion to strike that these complaints "include calls that she made to the Rave corporate hot line." (Doc. # 77, p. 2). Plaintiff complains that Rave did not produce documentation of these complaints in response to her discovery requests. However, plaintiff has not filed a Rule 56(f) motion. Therefore, the court does not rely on the asserted failure to produce as a basis for denying the present motion. Additionally, defendant's failure to produce documentation would not prevent plaintiff from providing her own specific affidavit testimony regarding her own complaints.

complained about Zatarain's conduct to Richard Garrett at Rave's corporate office.  Even if plaintiff subjectively perceived Zatarain's statements and Bryant's reaction as actionable racial discrimination, her complaints to Bryant and Garrett are not "protected activity" unless plaintiff's subjective belief was – when measured against the substantive law – objectively reasonable.  The court concludes that Zatarain's conduct toward plaintiff and Bryant's statement that Zatarain "was on an equal level" with plaintiff falls far short of establishing the existence of a racially hostile environment and that plaintiff has not established that her belief that this conduct constituted actionable racial discrimination was objectively reasonable.

Plaintiff's deposition testimony likewise does not provide specific evidence that plaintiff engaged in protected activity before her termination.  Plaintiff testified that, after the incident in which Zatarain made the racial comment, she went to Bryant and complained about: (1) Zatarain's conduct; (2) Pettit's marking missing concession items as damaged; and (3) employees working more than fifteen hours per day.  (Dixon depo., pp. 101-04).  A couple of weeks later, Zatarain cursed at plaintiff after she chastised him for throwing candy on the floor.  (Id., pp. 117-18).  A few days later, he cursed at her again about the movie pick-up. (Id., pp. 119-22).  Plaintiff then complained to Bryant again about Zatarain.  (Id., pp. 122-23).  Plaintiff thereafter called Garrett at the corporate office and told him about Pettit's marking concession items as damaged, the employee hours, and "the way they were allowing Coleman Zatarain to talk to [her]."  She told him, "I feel like I'm being retaliated against."  With regard to Zatarain, she complained to Garrett that "Cole was cursing [her] out

and yelling at [her] and talking down to [her]."  (Id., pp. 97-98, 126-28).[34]   At some point,

plaintiff called Garrett for the second time; she told him that Zatarain "was doing the same

thing" and that Bryant was treating plaintiff and Zatarain "like [they] were on the same

level."   She also complained that "they" were doing something they shouldn't with "Icy

cups" and "large" cups.   She told Garrett that Zatarain was "harassing" her "because he kept

going off about insurance and saying ugly things to [plaintiff]." (Id., pp.  129-30).  Plaintiff

further testified:

> Q.  Did you tell Richard that you felt that you were being discriminated
> against?
>
> A.  I may have told Brad.
>
> Q.  How many times did you talk to Brad?
>
> A.  Maybe twice.
>
> Q.  When was the first time that you talked to Brad?
>
> A.  When I got fired.
>
> Q.  That was the first time you talked to Brad?
>
> A.  Yes.
>
> Q.  After you had been fired, you told Brad that you thought you had been
> discriminated against?
>
> A.  Yes.

---

[34] Plaintiff's testimony about the timing of this complaint is indefinite.  She testified that it was "probably after" she got her raise (Dixon depo., p. 100-01) on February 27, 2004 (Plaintiff's Exhibit 4), "probably" before she got her first write-up (Dixon depo., p. 114) and that it "could have been" in July 2004 (id., p. 162-63).

(Dixon depo., p. 131).

Although plaintiff used the words "retaliate" and "harassed" in her conversations with Garrett, her deposition testimony does not establish the existence of a genuine issue of material fact regarding whether her conversations with Garrett constituted protected activity. Plaintiff has not provided evidence that her complaints to Garrett – even as to the first incident with Zatarain – pertained to conduct which could reasonably be viewed as actionable racial discrimination.   Likewise, the conduct opposed by plaintiff in her complaints to Bryant – the single racial comment by Zatarain and the two additional instances of cursing – are not sufficient to establish a reasonable belief of actionable discrimination.

As noted above, plaintiff bears the burden of designating specific facts demonstrating that there is a genuine issue for trial.   Celotex, *supra*; Fed. R. Civ. P. 56(e).  Some of the evidence of record relied on by plaintiff is not sufficiently specific regarding the timing, content and other circumstances of plaintiff's complaints to demonstrate that they constituted protected activity.  Where plaintiff does provide specific testimony regarding her complaints, the evidence does not demonstrate that the conduct opposed by plaintiff could reasonably be viewed as constituting actionable racial discrimination.  Accordingly, defendants are entitled to summary judgment on plaintiff's retaliation claims.

## CONCLUSION

For the foregoing reasons, it is ORDERED that defendants' motion for summary judgment (Doc. # 45) is GRANTED to the extent that:

(1) plaintiff's Title VII claims are DISMISSED as to individual defendant Bryant;

(2) plaintiff's Title VII and § 1981 hostile environment claims and retaliation claims are DISMISSED; and

(3) plaintiff's Title VII and § 1981 disparate treatment claims are DISMISSED, to the extent the complaint alleges a "terms and conditions" claim independent of plaintiff's termination.

It is further ORDERED that the motion for summary judgment is DENIED as to plaintiff's Title VII and § 1981 termination claims.

It is further ORDERED that defendants' motions to strike (Docs. ## 65, 67, 68, and 69) are GRANTED to the extent set forth in this memorandum opinion, and DENIED in all other respects – either for the reasons set forth in this memorandum, or as MOOT.

It is further ORDERED that plaintiff's motion to strike new defense and redundant argument (Doc. # 80) is DENIED.

DONE, this 24th day of October, 2006.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE